**THE PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**CRAIG FRANCIS, Defendant**

Crim. No. F105/2008

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

October 5, 2009

150

CHRISTINE D. THOMAS, ESQ., Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, USVI, *For the Plaintiff.*

JEFFREY B.C. MOOREHEAD, ESQ., Christiansted, St. Croix, USVI, *For Ariel M. Smith, Esq.*

TERRY HALPERN, ESQ., St. Thomas, USVI, *For Craig Francis, Defendant.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(October 5, 2009)

On November 19, 2008, the jury returned a "Guilty" verdict on all five (5) counts of the Amended Information against the Defendant Craig Francis. Immediately upon the jury's discharge, counsel for the Defendant, Ariel M. Smith, Esq., made an oral motion for a new trial based on ineffective assistance of counsel. Thereafter, trial defense counsel submitted a written motion for new trial. The People opposed the motion. On January 30, 2009, this Court issued a Memorandum Opinion denying Defendant Craig Francis' motion for a new trial on all issues raised by the Defendant *except* the issue of ineffective assistance of counsel which was scheduled for a required evidentiary hearing. The evidentiary hearing came on for hearing on May 14, 2009. At the hearing, the parties were re-aligned. The Defendant Craig Francis was appointed new counsel Terry Halpern, Esq.; trial defense counsel, Ariel M. Smith, Esq. was represented by Jeffrey Moorehead, Esq.; and the People of the Virgin Islands were represented by the V.I. Department of Justice, Christine D. Thomas. Assistant Attorney General.

After the evidentiary hearing, the Court directed the parties to submit memoranda addressing whether trial defense counsel's failure to correctly label defense witnesses as "alibi" witnesses fell outside professional norms or below an objective test of reasonableness under *Strickland*[1] and if so, whether trial defense counsel's deficient representation prejudiced Defendant Craig Francis under the *Strickland* standard.

## I. BACKGROUND AND PROCEDURAL POSTURE

On March 4, 2008, S.A.J., the victim in this matter, appeared at the Emergency Room of the Roy Lester Schneider Hospital (hereafter "RLSH") for treatment as a result of an assault and poisoning. (Trial Transcript dated November 18, 2008 at pp. 43-44). S.A.J. was accompanied by Defendant Craig Francis, her ex-boyfriend. (Trial Transcript dated November 18, 2009 at pp. 44-45). As a result of what S.A.J, told the triage nurse and the RLSH emergency room personnel, the police were dispatched to the hospital to investigate a possible domestic violence offense. (Trial Transcript dated November 18 at pp. 43-44). Upon arrival at RLSH, law enforcement interviewed S.A.J. and Defendant Craig Francis separately. (Trial Transcript dated November 18, 2008 at pp. 44-46). After being advised of his constitutional rights, Defendant waived his rights and began giving a formal statement. (Trial Transcript dated November 18, 2008 at p. 48). Before abruptly ending his statement, Defendant claimed that he went to the home of S.A.J. after she attempted to commit suicide and called him (Defendant) for assistance and/or rescue. (Statement Narrative of Defendant Craig Francis dated March 4, 2008 at p. 1). Conspicuously absent from Defendant's statement was an alibi. The Defendant was then arrested on that same day.

On March 6, 2008, Defendant Craig Francis was taken before a judge where probable cause for the arrest was found. At his arraignment on Thursday, March 13, 2008, the Defendant was charged, *inter alia*, with assaulting S.A.J. after forcibly entering her residence in the early morning hours of March 4, 2009. The People ultimately charged Defendant Craig Francis in Count I, with aggravated rape in the first degree, in connection with domestic violence, in violation of V.I. CODE ANN. tit. 14 § 1701(3) and V.I. CODE ANN. tit. 16 § 91(b)(6); in Count II, with assault in the third degree, in connection with domestic violence, in violation of V.I. CODE

---

[1]    *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

ANN. tit. 14 § 297(3) and V.I. CODE ANN. tit. 16 § 91(b)(1), (2); in Count III, with assault in the third degree, in connection with domestic violence, in violation of V.I. CODE ANN. tit. 14 § 297(2) and V.I. CODE ANN. tit. 16 § 91(b)(1); in Count IV, with unlawful use of a dangerous weapon during the commission of a crime of violence, to wit: assault in the third degree, in violation of V.I. CODE ANN. tit 14 § 2251(a)(2)(B); and in Count V, with assault in the third degree, in connection with domestic violence, in violation of V.I. CODE ANN. tit. 14 § 297(2) and V.I. CODE ANN. tit. 16 § 91(b)(1), (2). The Defendant pled "Not Guilty," through counsel, to all the charges and demanded a trial by jury.

Prior to trial, counsel for the respective parties filed motions *in limine*. The rulings by his Court and the timing of the rulings are critical regarding the defense advanced and the ultimate outcome of this prosecution. Significantly, on Wednesday, November 12, 2008, at the final pretrial conference, this Court conditionally denied the People's Motion to Admit Prior Bad Acts Evidence Pursuant to F.R.E, 404(b) *unless* the Defendant testified and raised issues of "identity" by contending that S.A.J.'s injuries were self-inflicted or committed by some other person. The Court's ruling obviously required an immediate revamping of the defense which became apparent when trial defense counsel abruptly abandoned the acquisition of the victim's cellular phone records after months of unrelenting demands for the People to produce the same.[2] Additionally, two (2) days before jury selection, counsel for the Defendant Craig Francis submitted the names of two (2) witnesses, which were specifically characterized as "non-alibi witnesses"

Next, on Friday, November 14, 2008, the jury was selected. On Monday, November 17, 2008, just before the trial began, defense counsel began "planting the seed" for an ineffective assistance of counsel claim by informing the Court that her client appeared to be "uncomfortable" with her performance as his counsel. (Trial Transcript dated November 17, 2009 at pp. 4 Lines 13-25). Upon being so notified, the Court gave the Defendant an opportunity to place his concerns on the record and he declined to do so. (Trial Transcript dated November 17, 2008 at pp. 9-10

---

[2]    The Court initially impermissibly and erroneously required the People to produce the cellular phone records and they complied in part. Later, the Court determined that the records were not within the custody of the People and therefore, the People were not required to produce them pursuant to FED. R. CRIM. P. 16.

Lines 20-25; Lines 1-10). Instead, Defendant Craig Francis requested a five (5) minute recess that was granted by the Court. (Trial Transcript dated November 17, 2008 at p. 10 Lines 7-25).

After the five (5) minute recess, neither trial defense counsel nor Defendant informed the Court of any existing problem(s) requiring its attention or resolution, so the matter proceeded to trial. (Trial Transcript dated November 17, 2008 at p. 11). The People then presented their case in chief. On November 18, 2008, the People rested, after which, trial defense counsel made an oral motion for judgment of acquittal on all counts pursuant to FED. R. CRIM. P. 29 and argued in support of the motion on the record. (Trial Transcript dated November 18, 2009 at p. 94). The People opposed the motion and the Court denied the motion for judgment of acquittal. (Trial Transcript dated November 18, 2008 at p. 95). Trial defense counsel then called, on behalf of Defendant Craig Francis, Ms. Tyshawna Gibson. (Trial Transcript dated November 18, 2008 at p. 95). After taking the stand, Ms. Gibson proceeded to provide testimony that Defendant Craig Francis was elsewhere and not at S.A.J.'s residence at the time of the offense. (Trial Transcript dated November 18, 2008 at pp. 97-98 Lines 10-25; Lines 1-11). This "alibi" testimony was offered without the requisite notice under FED. R. CRIM. P. 12.1 being provided.

The Court immediately stopped the testimony and called a sidebar conference with the parties, after which, Ms. Gibson's entire testimony was stricken due to non-compliance with FED. R. CRIM. P. 12.1. Ms. Gibson was then excused.[3] (Trial Transcript dated November 18, 2008 at pp. 98-99 Lines 12-25; Lines 1-25). After the Court's ruling at the sidebar conference, Ms. Sherizma Jones was not called to testify.[4] Thereafter, the defense rested. (Trial Transcript dated November 18, 2008 at p. 100). The People did not present rebuttal witnesses. (Trial Transcript dated November 18, 2008 at p. 100). Thereafter, the parties made their

---

[3] During the sidebar conference, trial defense counsel informed the Court that Ms. Gibson was only going to offer testimony with respect to Defendant Craig Francis' whereabouts on the morning of the offense. (Trial Transcript dated November 18, 2008 at p. 99 Lines 18-21). To the extent the testimony was not alibi testimony, the testimony would be otherwise irrelevant.

[4] At the evidentiary hearing held on May 14, 2009, it was discovered that Ms. Jones was prepared to offer similar alibi testimony for the defense.

closing arguments. Trial Transcript dated November 18, 2008 at pp. 147-187).

On November 19, 2008, the Court gave the jury its final instructions and the jury retired to deliberate. (Trial Transcript dated November 19, 2008 at pp. 9-58 and pp. 59-65). Later, the jury informed the Court that it had reached a verdict. (Trial Transcript dated November 19, 2008 at pp. 79-80). The verdict was read in open court. (Trial Transcript dated November 19, 2008 at pp. 80-83). Defendant Craig Francis was found "Guilty" on all five (5) counts of the Amended Information. (Trial Transcript dated November 19, 2008 at pp. 80-83). Following the reading of the verdict, the Court asked trial defense counsel whether she wanted the jury polled, to which counsel responded in the affirmative. (Trial Transcript dated November 19, 2008 at p. 83). Each juror was polled by the Clerk and confirmed that the verdict represented his or her independent decision. (Trial Transcript dated November 19, 2008 at pp. 83-84). The jurors were then thanked and discharged. (Trial Transcript dated November 19, 2008 at pp. 84-85).

No sooner had the last juror left the courtroom when trial defense counsel literally "leaped" from her seat to make an oral motion for a new trial based on *ineffective assistance of counsel*. (Trial Transcript dated November 19, 2008 at p. 85). The Court requested Defendant's written submission(s). Thereafter, on November 26, 2008, trial defense counsel filed a written Motion for New Trial supported, *inter alia*, by a claim for ineffective assistance of counsel. The motion addressed trial defense counsel's characterization of impeachment witnesses as "alibi" witnesses and the Court's decision to strike their testimony for lack of the required "notice" under FED. R. CRIM. P. 12.1.

Moreover, the motion stated that counsel's failure to comply with FED. R. CRIM. P. 12.1 and the Court's subsequent exclusion of witness testimony *highly prejudiced* the Defendant. *Ergo*, Defendant Craig Francis was entitled to a new trial pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) for ineffective assistance of counsel and in the interest of justice. The People filed its Opposition to Defendant's Motion for New Trial on December 23, 2008. On January 30, 2009, this Court issued a Memorandum Opinion denying Defendant Craig Francis motion for a new trial. In its Opinion, this Court addressed each issue raised in trial defense counsel's motion *except* the

155

issue of ineffective assistance of counsel which was reserved for ruling following an evidentiary hearing.

On May 14, 2009, this matter came on for an evidentiary hearing. The People of the Virgin Islands appeared through the Office of the Virgin Islands Department of Justice, Assistant Attorney General, Christine D. Thomas, Esq. Trial defense counsel, Ariel Smith, Esq., was present and represented by Jeffrey B.C. Moorehead, Esq. The Defendant Craig Francis was present and represented by his newly appointed counsel, Terry Halpem, Esq. At this hearing, the Court outlined the *Strickland v. Washington* standard for an ineffective assistance of counsel claim and the requisite burden of proof required to be proven by a defendant. The Court heard testimony of several witnesses and closing arguments by counsel for the parties. Thereafter, all parties were instructed to submit memoranda addressing the distinction between "alibi" and "impeachment" witnesses and whether trial defense counsel's failure to correctly label witnesses fell outside professional norms or below an objective test of reasonableness under *Strickland*. The Court further ordered all parties to address whether trial defense counsel's deficient conduct, if any, prejudiced Defendant Craig Francis under the *Strickland* standard.

## II. STANDARD OF REVIEW FOR A MOTION FOR NEW TRIAL BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL UNDER *STRICKLAND V. WASHINGTON*

■ The Court may grant a new trial to a defendant if required in the interest of justice and must grant a new trial if there is a reasonable probability that error affecting the prior proceedings could have had a substantial influence on the jury's decision.

■ A motion for new trial is governed by SUPER. CT. R. 135[5] and

---

[5] SUPER. CT. R. 135 provides:

Rule 135. New Trial

The court may grant a new trial to a defendant if required in the interest of justice. The court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before, or within two years after, final judgment. A motion for a new trial based on other grounds shall be made within 10 days after finding of guilty, or within such further time as the court may fix during the 10-day period. In no event shall this rule be

FED. R. CRIM. P. 33.[6] When considering a motion for new trial, the court, having cautiously weighed the evidence and credibility of witnesses, may exercise its discretion to order a new trial, if it finds that the evidence preponderates heavily against the verdict; however, such an exercise of discretion is to be used only in exceptional circumstances. *United States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990); *U.S. v. Petersen*, 2009 U.S. Dist. LEXIS 2863 (D.V.I. 2009); *U.S. v. Dorsett*, 2009 U.S. Dist. LEXIS 2861 (D.V.I. 2009); *People v. Brewley*, 49 V.I. 137, 141 (Super. Ct. 2007); *United States v. Martorano*, 596 F. Supp. 621, 624 (E.D. Pa. 1984), *aff'd*, 767 F.2d 63 (3d Cir.) *cert. denied*, 474 U.S. 949, 106 S. Ct. 348, 88 L. Ed. 2d 296 (1985); *United States v. Phifer*, 400 F. Supp. 719, 723 (E.D. Pa. 1975), *aff'd*, 532 F.2d 748 (3d Cir. 1976); *Government of Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir. 1982); *United States v Mastro*. 570 F. Supp. 1388, 1390 (E.D. Pa. 1983); *Government of the Virgin Islands v. Leycock*, 19 V.I. 59 (D.C. V.I. 1982). (*See also Government of the V.I. v. Smalls*, 32 V.I. 175 (Terr. Ct. St. T. and St. J. 1995)); *Government of the Virgin Islands v. Commissiong*, 706 F. Supp. 1172 (D.C. V.I. 1989); *Government of the V.I. v. Grant*, 21 V.I. 20 (D.C.V.I. 1984).

█ Pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a convicted defendant's claim of ineffective assistance of counsel has **two components**. *Strickland*, 466 U.S. at 687. First, the **defendant must show that counsel's performance was deficient**. *Id.* This requires showing that the errors were so serious that counsel was not functioning at the level guaranteed to the

---

construed to limit the right of a defendant to apply to the court for a new trial on the ground of fraud or lack of jurisdiction.

[6]  FED. R. CRIM. P. 33:
   (a)   DEFENDANT'S MOTION. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
   (b)   TIME TO FILE.
   (1) *Newly Discovered Evidence.* Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for new trial until the appellate court remands the case.
   (2) *Other Grounds.* Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

defendant by the Sixth Amendment.[7] *Id.* In other words, counsel's performance fell outside professional norm. *Id.* Second, the **defendant must show that the deficient performance prejudiced the defense.** *Id.* This requires a showing that counsel's errors were to such a degree as to deprive the defendant of a fair trial and/or a trial whose result is reliable. *Id.* Simply put, a defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

█ Federal Courts of Appeals have now held that the proper standard for attorney performance is that of *reasonable effective assistance. Strickland,* 466 U.S. at 687. (*See also Trapnell v. United States,* 725 F.2d 149, 151-152). When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard or reasonableness.

█ The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermines the proper functioning of the **adversarial** process that the trial cannot be relied on as having produced a just result. *Strickland,* 466 U.S. at 669. Clearly, the U.S. Supreme Court in *Strickland* acknowledged the "adversarial" element is embedded within the trial, (*See also Kimmelman v. Morrison,* 477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).

## III. ANALYSIS

The issues to be resolved by this Court are: (1) whether Defendant Craig Francis' trial defense counsel's performance was "sound strategy" and not deficient conduct that fell outside professional norms and below an objective test of reasonableness as required under *Strickland v. Washington*; and (2) whether Defendant Craig Francis suffered any prejudice by mislabeling "alibi witnesses" as "impeachment witnesses" and if so, whether the prejudice was "self-inflicted" as a result of Defendant's continued and unabated recalcitrance, indifference and unwillingness to cooperate with his trial defense counsel.

---

[7] The Sixth Amendment to the Constitution of the United States is made applicable to the U.S. Virgin Islands pursuant to Section 3 of the Revised Organic Act of 1954. The complete Revised Organic Act of 1954 is found at 48 U.S.C §§ 1541-1645 (1995), reprinted in the V.I. Code Ann., Historical Documents. Organic Acts, and the U.S. Constitution at 73-177 (1995) (preceding V.I. CODE ANN. tit 1).

### A. Trial Defense Counsel's Performance Was "Strategic" In Nature And Not Deficient Conduct That Fell Outside Professional Norms And Below An Objective Test Of Reasonableness As Required Under *Strickland v. Washington*.

The core issue before the Court is whether trial defense counsel's proffer of witnesses as "impeachment" as opposed to "alibi" witnesses was the result of strategy or a misunderstanding of law. The mislabeling of defense witnesses ultimately resulted in the Court ruling that the testimony of those witnesses were inadmissible because counsel failed to file the requisite notice of alibi under FED. R. CRIM. P. 12.1. Because claims for ineffective assistance of counsel are analyzed under the framework set forth in *Strickland v. Washington*, it must be proven that trial counsel's labeling of witnesses was "deficient" in that it weakened the proper functioning of the adversarial process. *Strickland*, 466 U.S. at 669. (*See also Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001); *Jansen v. U.S.*, 369 F.3d 237, 244 (3d Cir. 2004)). This would satisfy the first prong of the *Strickland* test.

For a defendant to establish deficient conduct by his counsel and overcome the *Strickland* presumption that, under the circumstances, his counsel's actions might be considered sound trial strategy, a defendant must show either that: (1) the suggested strategy was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy. *Thomas v. Varner*, 428 F.3d 491 (3rd Cir. 2005). (*See also* U.S. CONST. Amend. 6).

At the onset, Defendant's initial defense was that he went to S.A.J's apartment on March 4, 2008 for "rescue" purposes. In his statement to police, Defendant Craig Francis indicated that the victim, S.A.J., contacted him after attempting suicide and that he traveled to her residence in Estate Hope in order to take her to the hospital.[8] However, after the People, via a motion *in limine*, requested to admit all prior bad acts by Defendant toward S.A.J. pursuant to FED. R. EVID. 404(b), the Court ruled that if Defendant Craig Francis testified and maintained that he rescued S.A.J. on the morning of March 4, 2008, then and only then

---

[8] Indeed, Defendant's "rescue theory" undoubtedly placed him at the crime scene.

would evidence of his prior attacks on S.A.J. be admissible.[9] After this ruling, trial defense counsel *strategically* decided to abandon Defendant's rescue theory and/or defense and substituted two (2) "alibi" witnesses[10] cloaked as "impeachment" witnesses to establish that Defendant was "elsewhere" at the time the offense occurred.[11] At the final pretrial conference, trial defense counsel emphatically stated that the two (2) new defense witnesses were *not* [emphasis added] alibi witnesses.[12] Additionally, at the evidentiary hearing held on May 14, 2009, trial defense counsel evidently found it necessary to discuss her intention to label Ms. Tyshawna Gibson and Ms. Sherizma Jones as "impeachment" witnesses as opposed to "alibi" witnesses with her supervisor. Debra Smith Watlington, Esq., First Principal Attorney at the Office of the Territorial Public Defender. (Transcript of Evidentiary Hearing dated May 14, 2009 at p. 39 Lines 6-17). Attorney Debra Watlington confirmed at the evidentiary hearing that she had a conversation with trial defense counsel *regarding the labeling of witnesses.* (Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 292-294 Lines 22-25; 1-25; 1-8). These discussions are evidenced in the following testimony and buttress the fact that trial defense counsel's labeling or mislabeling of defense witnesses was strategic:

---

[9] The Court reasoned that if Defendant Craig Francis intended to proffer a rescue theory and/or defense, the issue of "identity" would arise and would insinuate that S.A.J. or someone *other than* [emphasis added] Defendant Craig Francis inflicted S.A.J.'s injuries.

[10] Ms. Tyshawna Gibson and Ms. Sherizma Jones.

[11] Given the Court's conditional ruling, trial defense counsel was aware of the prejudicial nature of Defendant's prior bad acts toward S.A.J. (including an incident where he attempted to set her on fire with lighter fluid) and the irreparable damage such evidence would cause if admitted at trial. Moreover, trial defense counsel was "out of time" to provide a notice of alibi under FED. R. CRIM. P. 12.1.

[12] This matter came on for a final pretrial hearing on Wednesday, November 12, 2008 at which time trial defense counsel for Defendant Craig Francis indicated the following to the Court:

ATTORNEY SMITH: . . . Oh, and I just wanted to let the Court know, we do have two witnesses, *they're not alibi witnesses.*
THE COURT: *Okay.*
ATTORNEY SMITH: The names are Sherizma Jones —
THE COURT: How do you spell it?
ATTORNEY SMITH: S-h-e-r-i-z-m-a Jones and Tyshawna, T-y-s-h-a-w-n-a, Gibson.
(Transcript of Final Pretrial Conference dated November 12, 2008 at p. 18 Lines 7-17).

160

*Direct Examination of Ariel Smith, Esq.*:

**ATTORNEY HALPERN**: Did you discuss your failure to file the Notice of Alibi with Debra Watlington?

**ATTORNEY SMITH**: I discussed it with her and I think initially when it came up, I explained to her what the witnesses had said, and I think she might have told me that they're not necessarily alibi because they didn't — and maybe that was my mis-interpretation — they *weren't necessarily "alibi"* but probably impeachment, that's *why I went forward with them as impeachment witnesses*, **(emphasis provided) (Transcript of Evidentiary Hearing dated May 14, 2009 at p. 39 Lines 6-17)**

*Direct Examination of Debra Watlington. Esq.*:

**ATTORNEY HALPERN**: Did you ever tell Attorney Smith that — well, let me ask you. Did Attorney Smith ever specifically discuss with you the potential testimony of a Miss Gibson and Miss Jones?

**ATTORNEY WATLINGTON**: Are those the young ladies who were not permitted to testify? I can't remember.

**ATTORNEY HALPERN**: They were not permitted to testify at trial, basically placing Mr. Francis in Annas Fancy on the morning of March 4, 2008 instead of the apartment of S.A.J.?

**ATTORNEY WATLINGTON**: Yes, we discussed and *I'm aware that she did not intend to use those two individuals as alibi witnesses, but for impeachment purposes.*

**ATTORNEY HALPERN**: *Did she tell you that those witnesses could place the defendant at a location other than the scene of the alleged crime?*

**ATTORNEY WATLINGTON**: *Yes*, for a couple hours.

**ATTORNEY HALPERN**: And did you tell Attorney Smith if that would be considered impeachment testimony as opposed to alibi testimony?

**ATTORNEY WATLINGTON**: *No. I didn't tell her one way or the other.* (*emphasis provided*)

**ATTORNEY HALPERN**: Did you advise her to file a Notice of Alibi to protect the defendant?

**ATTORNEY WATLINGTON**: No, I did not advise her.

**ATTORNEY HALPERN**: Did she discuss the necessity for filing a Notice of Alibi in order to introduce that testimony?

161

**ATTORNEY WATLINGTON:** No, we didn't discuss that. **(Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 292-294 Lines 22-25;1-25; 1-8)**

Significantly, trial defense counsel is a skilled and "seasoned" defense attorney who has been practicing law in the U.S. Virgin Islands since November of 1994. (Transcript of Evidentiary Hearing dated May 14, 2009 at p. 14 Lines 4-5). Prior to and upon taking and passing the Virgin Islands Bar, trial defense counsel was employed as a law clerk at the Territorial Court, now Superior Court. (Transcript of Evidentiary Hearing dated May 14, 2009 at p. 14 Lines 7-9). As a law clerk, trial defense counsel became quite familiar with procedural rules in criminal cases. (Transcript of Evidentiary Hearing dated May 14, 2009 at p. 14 Lines 16-18). Upon completion of her clerkship with the Court, trial defense counsel worked for a prestigious law firm on the island of St. Thomas and thereafter obtained employment with the Office of the Territorial Public Defender in November of 2006.

As an attorney at the Office of the Territorial Public Defender, trial defense counsel admitted to handling, over the course of twelve (12) years, "hundreds, probably close to thousands" of criminal cases. (Transcript of Evidentiary Hearing dated May 14, 2009 at p. 15 Lines 10-13).[13] Therefore, there is little credence in the contention that trial defense counsel misunderstood the law with respect to alibi or alibi witnesses. Indeed, trial defense counsel's labeling of "alibi witnesses" as "impeachment witnesses" was a tactical decision to circumvent the notice requirement. This strategy conveniently relieved trial defense counsel from providing notice to the People of the substance of the witnesses' testimony and denied counsel for the People an opportunity to "check out" the witnesses' intended testimony. As such, trial defense counsel's tactics created a "trial-by-ambush" situation that would permit potentially incredulous contentions to go "unchecked" and unchallenged by the prosecution.

After analyzing the legal and evidentiary landscape, trial defense counsel determined that the defendant would be better served by foregoing filing a Notice of Alibi. Courts, however, have held that a deliberate tactical choice of this nature cannot form the basis for an

---

[13] These cases include but are not limited to jury trials.

ineffectiveness claim.[14] *U.S. v. Pungitore*, 15 F. Supp. 2d 705 (3rd Cir. 1998). Moreover, courts have declined to characterize counsel's performance as ineffective, where counsel acted according to the defendant's restrictions on strategy *Id.* at 729. (*See also Payne v. United States* 78 F.3d 343, 346 (8th Cir. 1996) (holding counsel's failure to present alternative defense strategy is not ineffective assistance when both counsel and defendant decided to "try and win the whole ball of wax" by pursuing "snitch strategy"). Additionally, the *Pungitore* court held that petitioner's attorney was not ineffective for choosing not to call alibi witnesses. *Id.* Specifically, the *Pungitore* court reasoned that counsel's determination not to call alibi witnesses, just like his decision not to call character witnesses, was a valid tactical trial decision. *Id.* at 730.

In an effort to offer her client the "best of both worlds," trial defense counsel made the tactical decision to mislabel "alibi" witnesses as "impeachment" witnesses and if that strategy failed, she would raise an ineffective assistance of counsel claim against herself. The speed in which trial defense counsel readily admitted her incompetence was unprecedented, was tantamount to and can only be compared to "falling on the sword of Damocles." By offering to be the "sacrificial lamb," trial defense counsel sought to award Defendant a new trial, at any cost and give him a "second bite at the apple."

---

[14]  At the evidentiary hearing held on May 14, 2009, both Jennifer Brathwaite, the mother of Defendant Craig Francis and Ira Baptiste, her fiancé, testified as having expressed to trial defense counsel their desires to testify that Defendant Craig Francis was at their home at the time of the offense. (Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 114-117); (Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 198-201). However, the record discloses that Ms. Brathwaite, in a statement to police, initially indicated that she was unable to establish Defendant's whereabouts after she went to bed at approximately 9:00 p.m. on March 3, 2008, just a few hours before the attack on S.A.J.. As such, Ms. Brathwaite's testimony was apparently concocted and/or fabricated for purposes of the evidentiary hearing. Mr. Baptiste's testimony was *equally* incredible. Interestingly, Mr. Baptiste, a retired Superior Court Marshal, unconvincingly testified that although he was able to account for Defendant Craig Francis' whereabouts at the time of the offense, he decided against initially communicating that fact to trial defense counsel or independently coming forward with this information. Mr. Baptiste's version of events "parroted" the testimony given by Ms. Brathwaite, with whom he had and continues to have a long romantic relationship. Thus, neither Ms. Brathwaite's nor Mr. Baptiste's testimony constituted newly discovered evidence nor was the testimony worthy of belief. Additionally, the incredible nature of the testimony triggered trial defense counsel's ethical obligation not to suborn perjury. Therefore, trial defense counsel made a reasonable and strategic decision not to use Ms. Brathwaite and/or Mr. Baptiste as alibi witnesses at trial.

For the foregoing reasons, trial defense counsel's procedural and evidentiary choices prior to, during and post trial were undeniably strategic, within professional norms, did not fall below an objective test of reasonableness and can hardly be deemed deficient performance under *Strickland* for purposes of an ineffective assistance of counsel claim. Indeed each decision made by trial defense counsel prior to and/or during trial fell within calculated trial strategy and constituted zealous, if not overzealous, representation of Defendant Craig Francis.

### B. Trial Defense Counsel's Decision To Label Alibi Witnesses As "Impeachment Witnesses" Did *Not* Prejudice Defendant Craig Francis Under The *Strickland* Standard.

■ Even if Defendant Craig Francis could establish that trial defense counsel's performance was deficient, he has not met his burden on the second prong of *Strickland* because Defendant must show that trial counsel's "deficient performance prejudiced his defense in that *but for* the deficient performance, the result would have been different." *Strickland*, 466 U.S. at 687. Assuming *arguendo*, trial defense counsel's labeling of witnesses was influenced by a "misunderstanding of law," this deficient conduct did not prejudice Defendant within the meaning of *Strickland* given the weight of the People's case against him. *U.S. v. Murillo*, 269 Fed. Appx. 705 (9th Cir. 2008).

Even if Ms. Gibson and Ms. Jones were allowed to testify as to having seen Defendant in Anna's Fancy at approximately 7:00 a.m. and again at 11:00 a.m. on the morning of the offense, this testimony would not have ruled out Defendant's presence at S.A.J.'s residence in Estate Hope at 3:00 a.m. through 7:00 a.m. and by noon, shortly thereafter Defendant appeared at RLSH with S.A.J. A reasonable juror could therefore still find that Defendant Craig Francis was in fact S.A.J.'s assailant on the morning of March 4, 2008. Additionally, other evidence and witness testimony introduced at trial were sufficient for a jury to find Defendant guilty. As a result, a new trial would *not* provide for a different result. Furthermore, the People, during the first trial, "slept" on their rights and failed to use evidence under FED. R. EVID. 413 instead of FED. R. EVID. 404(b). So, even if a new trial were allowed, all Defendant's prior and similar sexual bad acts against the victim, S.A.J., can be introduced by the People *without* the normal FED. R. EVID. 403 and FED. R. EVID. 404 considerations.

### C. Any Prejudice Against Defendant Craig Francis Was *Self-Inflicted* As A Result of His Continued And Unabated Recalcitrance, Indifference and Unwillingness to Cooperate With Trial Defense Counsel.

It is well settled that whenever "a defendant institutes a claim for ineffective assistance of counsel, he must show that he was prejudiced *by his attorney's inadequacies.*" *Rivera v. Government of the Virgin Islands*, 981 F. Supp. 893, 37 V.I. 68 (D.V.I. 1997). Here, Defendant was prejudiced by his *own* [emphasis added] inadequacies. The testimony during the evidentiary hearing was replete with communication issues with Defendant. In fact, both before and during trial Defendant was unwilling to cooperate with his counsel and private investigator and refused to offer any information for his defense *other than* [emphasis added] the contention that he rescued S.A.J. on the morning of March 4, 2008.

Even though Defendant's rescue theory became a potential "liability" after the Court's conditional ruling to allow the People to admit evidence of Defendant's prior bad acts against S.A.J. if Defendant pursued his rescue theory, Defendant's recalcitrance, indifference and refusal to cooperate with his trial defense counsel and/or investigator intensified. With the trial just days away, trial defense counsel found herself frantically re-crafting a defense at the "eleventh hour" with little or no assistance from the Defendant.[15]

Defendant's unwillingness to cooperate with trial defense counsel and the investigator is supported from the following testimony at the evidentiary hearing on the claim for ineffective assistance of counsel:

*Direct Examination of Ariel Smith, Esq.:*

ATTORNEY HALPERN: Now, other than a conversation about medical records, did you ask Mr. Francis where he was on March 4, 2008 between 3:00 a.m. and 11:00 a.m.?

ATTORNEY SMITH: Yes, I did. At that time, I asked him where he was, he indicated to me that he had had a relationship with some woman that was a cousin of somebody by the name of Sharifa Joseph. He wasn't

---

[15] At the evidentiary hearing held on May 14, 2009, trial defense counsel admitted that she did not have an "alibi" defense to present until November 5, 2008. (Transcript of Evidentiary Hearing dated May 14, 2009 at p. 38 Lines 18-19).

able to tell me where she lived, where she worked, or any of that. He told me that he would get back to me with that information.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at p. 19 Lines 3-14)**

ATTORNEY HALPERN: Okay. Did you make an attempt to contact Miss Sharisma (sic) Joseph?

ATTORNEY SMITH: He gave me no information as to how to contact her. He said his — he would talk to his mother about it and he would see what his mother could do for him. He didn't have any information with regard to how to make contact with that person.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at p. 20 Lines 4-11)**

ATTORNEY HALPERN: Do you recall having a conversation with him or asking him if he had any other witnesses, any other information about witnesses who could place him other than in S.A.J.'s apartment between 3:00 a.m. and 11:00 a.m. on March 4, 2008?

ATTORNEY SMITH: I don't exactly know what date I had this conversation with him. Well, let me — I had a conversation with him where I asked him specifically with regards to where he was, and I asked him also specifically regarding some of the allegations that had been made in the — that I've gone through in the discovery, and he became extremely hostile, yelling and screaming, and telling me that I'm against him, and he was so loud that I remember one of the correction officers coming to me afterward and asking me if I was all right, and I remember subsequently there was a hearing after we had that conversation where he apologized for his behavior. But he told me he was under stress or whatever, but I remember specifically asking him regarding the allegations. The allegations in particular was how did he get into the house, and he, you know, and I said, you know, I've spoken to S.A.J., and you know, we need to be able to explain to the jury what this whole thing is about in something that they would understand.

ATTORNEY HALPERN: Let me get back to the specifics. Did he give you at that time —

ATTORNEY SMITH: No, he did not.

ATTORNEY HALPERN: — the names or any other information about witnesses?

ATTORNEY SMITH: Not at the time when he refuses to — he felt that I was against him and he basically walked out of the meeting.

**ATTORNEY HALPERN**: And would you agree that you found him difficult to speak to?

**ATTORNEY SMITH**: Virtually impossible to speak to. He was extremely uncooperative and his attitude was that I am continually working against him, I'm only believing what she says, I don't believe anything that he says and that he don't want to tell me nothing because I'm not working on his behalf.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 21-23)**

**ATTORNEY HALPERN**: All right. Now, you indicated that at some point you and Mr. Jackson had a conversation with the defendant specifically about witnesses in connection with this case?

**ATTORNEY SMITH**: Yes.

**ATTORNEY HALPERN**: Do you recall what date that was?

**ATTORNEY SMITH**: That was November 5th.

**ATTORNEY HALPERN**: And what date was the trial scheduled for?

**ATTORNEY SMITH**: Probably a week or two later. What happened is, because of how he had behaved the time before, the fact that he would not provide me any information, I decided I wasn't going to see him alone anymore and that's why on that particular date I went with Jackson.

**ATTORNEY HALPERN**: And did you and Investigator Jackson get a list of witnesses and contact information from Mr. Francis?

**ATTORNEY SMITH**: No, that's not how conversations with Mr. Francis goes. When we went to this meeting, we were there probably about two hours with Mr. — between an hour or two hours with Mr. Francis asking him repeatedly where he had been, because he still had not provided me any information regarding Sharifa Joseph. I had also again — well, let me just finish the train of thought. He went to the west and came back, and when he finally gave us a name, I think he gave us the name of Sharisma, and he didn't know her last name. I think he might have given us the name of Tyshawna who lives upstairs and he didn't have a telephone number or anything.

**ATTORNEY HALPERN**: Did you ask Attorney Jackson to follow-up and attempt to contact these two witnesses at the location in Annas Fancy that Craig Francis had described?

**ATTORNEY SMITH**: I did more than that. As soon as we left the jail, both of us went to the house blowing the horn to find these young

women. When we got there, the lady who is Tyshawna lived upstairs, Sharisma lived downstairs, but neither of them was home. So, we left a message with the person that was downstairs who I believe was Sharisma's mother, and he left his card for them to make contact with us.

ATTORNEY HALPERN: Did they ever contact you?

ATTORNEY SMITH: I believe — they didn't contact me, but they did contact the investigator and I did meet with them later on.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 25-27)**

ATTORNEY HALPERN: Let's go back to the two witnesses. Were statements taken from these two witnesses?

ATTORNEY SMITH: Written statements, no, but you know, we talked to them with regard to what he had told us in terms of where he said he was. I think we even, after we found them. I went back to the jail and told him that I found them and he told me — his demeanor was very surprised that we did in fact find them or that we had went out to look for them.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 28-29)**

ATTORNEY HALPERN: Well, you returned to the jail on November 14, 2008 at 7:45 — .

THE COURT: a.m. or p.m.?

ATTORNEY HALPERN: — a.m.

ATTORNEY HALPERN: But that was how many days before trial?

ATTORNEY SMITH: Close to trial. Attorney Halpern, Mr. Francis is very difficult to talk to. He would not cooperate. He did not give any information. I was basically running around trying to figure out what kind of defense I was going to put on for him since he had given me no information, and as I got additional information, which was actually still coming in from the people in terms of various reports, I was trying to get them to him and explain them to him. So, there was a lot of things — because Mr. Francis also knew what time it was in the fact that trial was coming up, he was now — after he found out that we found the witnesses, then he became a little bit more cooperative because I guess he felt that I wasn't against him.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 29-30)**

■■■■■■■■■■

*Direct Examination of David H. Jackson*:

**ATTORNEY HALPERN**: And is it accurate that the date (of the offense) was March 4, 2008 and the time was from 3:00 a.m. to approximately 11:30 a.m.?

**DAVID H. JACKSON**: That is correct.

**ATTORNEY HALPERN**: And did you ask Mr. Francis where he had been on that date and those times?

**DAVID H. JACKSON**: Well when I went over the discovery with him, he was not in the best of mood that day, and he kept insisting, *"all I know is I didn't do it, I know I didn't do it."* I said to him, well, Craig, you know, where were you on that night? He said he was home for a while and at some point he left, and he wasn't the easiest client to deal with because there were times that he would talk to you, then there were times that he would just clam up and go blank. So, I told him that I would give him some time to think about it and I'll come back and see him at a later date.

**ATTORNEY HALPERN**: And did you return?

**DAVID H. JACKSON**: Yes I did. I returned sometime later and we spoke, and for a while then he kept insisting, *"listen, I didn't do it,"* and he would go into a tantrum about how nice he was to this young lady, that if it hadn't been for his guidance she would never have owned a car, she would never have had an apartment. And I would say, well listen, let's stick to the point. You know, where were you on that night? *At some point during that conversation, which would have been our second conversation, he said that I would have to ask his mother, you know.* So, I said, well, I'm asking you, and then he would go off into these strange little tantrums. So, I left it alone again. Shortly thereafter, several weeks had passed, and sometime in October of that year before I went on leave, I went up to the jail to see him again and they told me he was in the hospital. So, I went off on leave in October and I came back in the latter part of October, and when I came back, Attorney Smith said to me that she needed me to go to the prison with her to speak to Mr. Francis because the last time she went there, he was very rude and belligerent and he refused to talk to her. So, if my memory serves me correctly, a couple of days elapsed between that conversation and the date that we went to the jail, and we went to the jail I believe it was November 5th of last year.

169

**ATTORNEY HALPERN**: And did you speak with him at that time in the presence of Attorney Ariel Smith?

**DAVID H. JACKSON**: That is correct, and I remember distinctly telling him that, you know, we're now on the 23 hour and he needs to start, you know, cooperating with us because the charges for which he has been arrested are very, very serious and in order for us to adequately defend him, we need his cooperation.

**ATTORNEY HALPERN**: Did he give you the names of any alibi witnesses at the time?

**DAVID H. JACKSON**: Yes, he gave us the names of two witnesses. After some prodding and some calming him down, he finally said that on that night he was home, and sometime the following morning, he left and he went in the area of Annas Fancy where Tynisha (sic) and Sherisma lived and he spent some time —.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 88-91)**

*Direct Examination of Craig Francis*:

**ATTORNEY HALPERN**: Do you remember meeting with Attorney Ariel Smith at the jail before trial?

**CRAIG FRANCIS**: Huh?

**ATTORNEY HALPERN**: Do you remember meeting with Attorney Smith at the jail several months before trial?

**CRAIG FRANCIS**: I don't know when before the trial.

**ATTORNEY HALPERN**: Do you remember how many times you met with Attorney Smith?

**CRAIG FRANCIS**: I don't know, maybe four times I could think of.

**ATTORNEY HALPERN**: On any of those occasions, did you tell her where you were on March 4, 2008 when you were suppose to have been at Stacey Johnson's apartment?

**CRAIG FRANCIS**: Repeat that please?

**ATTORNEY HALPERN**: Did you — on any of the times you met with Attorney Ariel Smith, did you tell her where you were on March 4, 2008 from 3 o'clock in the morning until 11:00 a.m.?

**CRAIG FRANCIS**: No, I couldn't because when I was talking to her about it, she was writing about something else different and we just got

170

into a little dispute. So, I just, I just, it just — the conversation had to cut off somehow, I can't remember how, if I did it or she did it.

**ATTORNEY HALPERN**: Do you remember ever telling Attorney Smith when you spoke with her at the jail that you were at Tyshawna Gibson or Sharisma Jones — I'm sorry, Tyshawna Gibson and Sharisma Jones in Annas Retreat — in Annas Fancy on the morning of March 4, 2008?

**CRAIG FRANCIS**: Can you repeat that?

**ATTORNEY HALPERN**: Do you recall speaking with Attorney Ariel Smith on any of the occasions that you met with her in the jail prior to the trial and telling her that you were with Tyshawna Gibson and Sharisma Jones on the morning of —

**CRAIG FRANCIS**: I think so. I think so.

**ATTORNEY HALPERN**: — of March 4. 2008? You think so. Did you ever write out any names of witnesses for her or give her phone numbers?

**CRAIG FRANCIS**: No, no, no.

**ATTORNEY HALPERN**: No?

**CRAIG FRANCIS**: I don't know.

**ATTORNEY HALPERN**: Why not?

**CRAIG FRANCIS**: Huh?

**ATTORNEY HALPERN**: Why not?

**CRAIG HALPERN**: What? Why not what?

**ATTORNEY HALPERN**: Why didn't you give her the information?

**CRAIG FRANCIS**: I did at some point.

**ATTORNEY HALPERN**: Do you know at what point?

**CRAIG FRANCIS**: No. I can't think right now you know. Really men. It doesn't seem like anything I say make sense. If the results ain't make sense, is the words I saying to you all going to make sense? That is much more accurate than the words that is coming out my mouth.

**ATTORNEY HALPERN**: Do you know if you gave her any names of the people to contact on behalf of your defense?

**CRAIG FRANCIS**: Yeah, I gave her Tyshawna and Sharisma name.

**ATTORNEY HALPERN**: Do you know when you gave her those names?

**CRAIG FRANCIS**: I don't know. The time she came.

**ATTORNEY HALPERN**: Was anybody else with her when you gave her those names?

171

CRAIG FRANCIS: I don't know, maybe one time by herself and maybe another time with Jackson.

**(Transcript of Evidentiary Hearing dated May 14, 2009 at pp. 247-250)**

THE COURT: When did you tell Attorney Smith that you wanted to testify? When is the first time you told her you wanted to testify?

CRAIG FRANCIS: Repeat?

THE COURT: When is the first time you told her you wanted to testify?

CRAIG FRANCIS: I don't remember around that time. I don't remember too much.

THE COURT: Did she tell you that if you testified, and it was your testimony that you went over to S.A.J.'s house to rescue her because she said that she was going to commit suicide, that the prior domestic violence bad acts would come up? Didn't she tell you that?

CRAIG FRANCIS: Yes, she told me that, but I wasn't studying that at the end because I could explain all of this and I have proof about everything, even November.

THE COURT: You remember when that ruling was, that week before the trial, that if you took the stand, that was what would happen?

CRAIG FRANCIS: Yeah, I heard her, yeah. I heard about it, yeah. I heard about it, yeah.

THE COURT: And is that when these names — when did you first give her the names of your alibi witnesses, Miss Gibson and Miss Jones?

CRAIG FRANCIS: I can't really recall, like I said. I can't recall. That was last year sometime.

THE COURT: But it was before this trial?

CRAIG FRANCIS: Yes, it was before.

THE COURT: Was it after I ruled that you wouldn't be able to testify unless those other things came in?

CRAIG FRANCIS: That was before the trial.

THE COURT: What was Miss Safiya Joseph suppose to testify to?

CRAIG FRANCIS: I don't know. Whatever she see.

THE COURT: Do you know that an attorney cannot put a witness on if they think that that a person is going to suborn to perjury

CRAIG FRANCIS: I guess.

**(Transcript of Evidentiary' Hearing dated May 14, 2009 at pp. 270-271)**

Given the above testimony, it cannot be said that trial defense counsel's actions prejudiced Defendant Craig Francis. Rather, the prejudice against Defendant, if any, was self inflicted due to his belligerent behavior toward trial defense counsel and his investigator as well as his unwillingness to cooperate in his defense for trial.

## III. CONCLUSION

A new trial is not warranted on the basis of ineffective assistance of counsel because: (1) the Defendant Craig Francis did not overcome the *Strickland* presumption that, under the circumstances, the trial defense counsel's performance was "strategic" in nature and not deficient conduct that fell outside professional norms and below an objective test of reasonableness as required under *Strickland v. Washington*; (2) the trial counsel's decision to label "alibi" witnesses as "impeachment" witnesses did not prejudice Defendant Craig Francis under the *Strickland* standard; (3) assuming *arguendo* that counsel's performance was deficient, the defendant failed to demonstrate a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceedings would have been different; (4) that any prejudice against Defendant Craig Francis was self-inflicted as a result of his continued and unabated recalcitrance, indifference and unwillingness to cooperate with trial defense counsel; and (5) trial counsel's conduct did not so undermine the proper functioning of the adversarial process that the trial could not be relied on as having produced a just result.

Accordingly, Defendant's motion for a new trial based upon ineffective assistance of counsel is **DENIED**.

### ORDER

THIS MATTER is before the Court on Defendant's Motion for New Trial based on ineffective assistance of counsel. For reasons stated in the accompanying Memorandum Opinion of even date, it is

**ORDERED**, that Defendant's Motion for Hew Trial shall be **DENIED**; and it is further

**ORDERED**, that the above-styled matter shall come on for sentencing on *Monday, October 19, 2009 at 9:00 a.m. Courtroom I*; and it is further

**ORDERED**, that a copy of this Order shall be directed to Christine Thomas, Esq., Assistant Attorney General, Jeffrey B.C. Moorehead, Esq.,

173

counsel for Ariel Smith, Esq., and Terry Halpern, Esq., *new* counsel for Defendant, and a copy served on the Defendant, **Craig Francis**.